IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 10, 2008

Charles R. Fulbruge III
Clerk

No. 08-10424

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

CLARENCE ROBINSON

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before REAVLEY, STEWART, and OWEN [*], Circuit Judges.

REAVLEY, Circuit Judge:

Before us is Clarence Robinson's request for counsel to represent him in his appeal. Robinson had filed a motion on his own behalf in district court to take advantage of the retroactive amendment to the Sentencing Guidelines that provides federal prisoners convicted of crack-cocaine offenses the possibility of receiving a sentence reduction. The court granted the motion and reduced Robinson's 180-month sentence by 5 months. We grant the request for counsel in the interest of justice.

I.

_____

[*] Judge Owen joins only Part III.

In the 1980s, crack cocaine burst onto the drug scene, resulting in an epidemic that engulfed large portions of the country.[1] Senator Lawton Chiles remarked in 1986 that "[t]he whole Nation now knows about crack cocaine. They know it can be bought for the price of a cassette tape[] and make people into slaves. It can turn promising young people into robbers and thieves, stealing anything they can to get the money to feed their habit."[2] To quickly combat this plague, Congress rushed to pass the Anti-Drug Abuse Act of 1986, which mandated harsh sentences for crack offenses.[3] Congress also made the decision to draw a dramatic sentencing distinction between powder-cocaine and crack-cocaine offenses. Although crack and powder cocaine are chemically the same,[4] various members of Congress believed that "crack is more addictive than powder cocaine"; "that it causes crime"; "that it has perilous physiological effects such as psychosis and death"; "that young people are particularly prone to becoming addicted to it"; and "that crack's low cost per dose and ease of manufacture would lead to even more widespread use of it."[5] As a result, Congress determined that 1 gram of crack would be considered equivalent to 100 grams of powder cocaine for purposes of applying the 1986 Act's mandatory

---

[1] William Spade, Jr., Beyond the 100:1 Ratio: Towards a Rational Cocaine Sentencing Policy, 38 ARIZ. L. REV. 1233, 1243–44 (1996) ("[B]y the early 1980s, crack use had exploded, spreading to major cities throughout the country. Drug experts agree that the crack epidemic that hit the United States during the 1980s was a broad-based phenomenon that simultaneously arose in several cities and was driven by drug dealers of different nationalities, races and ethnic groups." (footnotes omitted)) [hereinafter Spade].

[2] Id. at 1251 n.118 (quoting 132 CONG. REC. 26,447) (1986)).

[3] Id. at 1249–56 (discussing the 1986 Act and its expedited trip through Congress).

[4] United States v. Gunter, 462 F.3d 237, 240 n.3 (3d Cir. 2006) (explaining that powder cocaine is converted back into its base form as "crack" by cooking it with baking soda and water).

[5] Spade, supra note 1, at 1252–55 (footnotes omitted) (summarizing the 1986 Act's legislative history and also noting that "[r]ead as a whole, the abbreviated legislative history of the 1986 Act does not provide a single, consistently cited rationale for the crack-powder penalty structure").

minimum penalties.[6] While possession of 5 grams of crack would result in a five-year mandatory minimum sentence, it took 500 grams of powder cocaine for the same penalty.[7] The 1986 Act's legislative history contains "no discussion of the 100:1 ratio."[8] It was selected, however, after Congress decided to double the 50:1 ratio found in an earlier version of the legislation to "symbolize redoubled Congressional seriousness" on the issue.[9]

Meanwhile, the newly created Sentencing Commission was tackling the issue of creating the Sentencing Guidelines. While most of the Guidelines were created "using an empirical approach based on data about past sentencing practices," the Commission decided to create Guidelines for drug offenses by using the 1986 Act's weight-driven scheme.[10] Thus, the offense level for a particular drug offense was tethered to the type of drug and drug weight.[11] In determining the offense level for the possession or sale of crack and powder cocaine, the Commission simply repeated the 100:1 ratio found in the 1986 Act.[12]

Over the next two decades the 100:1 ratio was subjected to constant criticism, as commentators argued that the ratio was unjustified and the product of a severe overreaction, as the crack epidemic had not turned into the

---

[6] See id. at 1252.

[7] 21 U.S.C. § 841(b).

[8] Spade, supra note 1, at 1252.

[9] United States v. Clary, 846 F.Supp. 768, 784 (E.D. Mo. 1994) (holding that the 100:1 ratio violated the constitutional guarantee of equal protection of the law because of its disproportionate impact on African-Americans) (internal quotation marks omitted), rev'd, 34 F.3d 709 (8th Cir. 1994).

[10] Kimbrough v. United States, 128 S. Ct. 558, 567 (2007).

[11] Id.

[12] Id.

cataclysmic event many had feared.[13]  The Sentencing Commission itself eventually led the charge to change the ratio.  Beginning in 1995, the Commission determined that the ratio was not defensible, and it proposed an amendment to the Guidelines that would implement a 1:1 ratio.[14]  Congress rejected the amendment.[15]

The Commission issued its fourth report on the 100:1 ratio in 2007.[16]  It repeated its criticism of the ratio and the assumption about crack versus powder cocaine.[17]  The Commission then proposed an amendment to the Guidelines that would provide for a two level reduction for all crack offenses; and after Congress chose not to veto the amendment, the two-level reduction went into effect on

---

[13] See, e.g., U.S. SENTENCING COMM'N, SPECIAL REPORT TO CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY 2 (2007) ("Federal cocaine sentencing policy, insofar as it provides substantially heightened penalties for crack cocaine offenses, continues to come under almost universal criticism from representatives of the Judiciary, criminal justice practioners, academics, and community interest groups, and inaction in this area is of increasing concern to many, including the Commission.") [hereinafter 2007 Report]; Steven L. Chanenson & Douglas A. Berman, Federal Cocaine Sentencing in Transition, 19 FED. SEN'G REP. 291, 294 (2007) ("[C]urrent federal cocaine sentencing policy has a corrosive effect on both the American criminal justice system and our society at large.  Congress should and must do better, for vital symbolic reasons as well as substantive ones."); Spade, supra note 1, at 1271–75, 1279–82 (discussing the ineffectiveness of the 100:1 ratio; cataloguing the widespread opposition to the ratio, which included numerous federal judges; and noting that at least one federal judge resigned from the bench rather than continue to sentence defendants using the 100:1 ratio); Jesseca R.F. Grassley, Federal Cocaine Sentencing Policy Following the 1995 Cocaine Report: Issues of Fairness and Just Punishment, 21 HAMLINE L. REV. 347, 380 (1998) ("[T]housands of crack cocaine defendants continue to be sentenced under [the 100:1] ratio each year despite the existence of conclusive and credible evidence that its application results in unfair sentences.") (footnote omitted)).

[14] Amendments to the Sentencing Guidelines for United States Courts, 60 Fed. Reg. 25074, 25075–77 (1995) [hereinafter 1995 Amendments]; see also U.S. SENTENCING COMM'N, SPECIAL REPORT TO CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY (1995) (detailing the findings of the Commission).

[15] See H.R. Rep. No. 104–272, at 3–4 (1995), reprinted in 1995 U.S.C.C.A.N. 335, 337 (noting that the refusal to change the 100:1 ratio was based on the fact that "the evidence overwhelmingly demonstrates significant distinctions between crack and powder cocaine").

[16] See generally 2007 Report, supra note 11.

[17] Id.

November 1, 2007.[18] The Commission believed that the amendment is only a "'partial remedy'"[19] however, since the Guidelines still advance a "crack/powder ratio that varies (at different offense levels) between 25 to 1 and 80 to 1."[20] The Sentencing Commission then voted to make the amendment retroactive in an attempt to remedy some of the past injustice the 100:1 ratio had wrought.[21] The amendment became retroactive on March 3, 2008.[22]

## II.

In 1994, Robinson pleaded guilty to possession of crack cocaine with the intent to distribute. Robinson was responsible for possessing approximately 206 grams of cocaine base. After factoring in his criminal history, his Guideline range was 168 to 210 months. He was sentenced to 180 months in prison—i.e., 15 years. Had he been convicted of possessing a similar amount of powder cocaine, his sentence would have been between 4 and 5 years.

In March 2008, Robinson sought to take advantage of the retroactive crack amendment. He filed on his own behalf a motion (which was really a questionnaire given to him by the local federal public defender office) pursuant to 18 U.S.C. § 3582(c)(2). That subsection provides district courts with the discretion to apply a retroactive amendment to a particular case, after the court considers the sentencing factors in 18 U.S.C. § 3553(a), "if such a reduction is

---

[18] Kimbrough, 128 S. Ct. at 569.

[19] Id. (quoting the Commission's 2007 report).

[20] Id. at 573.

[21] See Press Release, U.S. Sentencing Comm'n, U.S. Sentencing Commission Votes Unanimously to Apply Amendment Retroactively for Crack Cocaine Offenses (Dec. 11, 2007), available at www.ussc.gov/PRESS/rel121107.htm.

[22] Id.

consistent with applicable policy statements issued by the Sentencing Commission."[23]

In support of his § 3582(c)(2) motion, Robinson attached a report compiled by the Bureau of Prisons that detailed his conduct in prison. The report shows that over the course of Robinson's 13 years in prison, he was generally well behaved. For example, the report includes a note from officials from the current prison housing Robinson that states that "he has maintained clear conduct, maintains positive work ethic, and keeps a good rapport with staff." The report also notes that Robinson currently works as a baker and is "appreciated greatly by the inmate population." The report further lists the numerous classes Robinson has completed. At the same time, in his 13 years in prison he has received three disciplinary infractions: one in 2000 for giving another inmate money so that he could use that inmate's phone time; one in 2001 for passing a note with his mailing address to a nurse at a public hospital; and one in 2004 for being disrespectful to a prison-staff member. The report also noted that in 1996, two years after he started serving his sentence, he was convicted of perjury. (No details on the perjury conviction have been provided.) Robinson was treated as requesting an attorney when he attached to his motion a letter from the office of the federal public defenders stating that it did not represent him.

The Government responded to Robinson's motion a month later with a 25-page sentencing memorandum making a series of arguments. With respect to the motion, the Government contended that Robinson was not entitled to an attorney—nor needed one—because the issues the case presented were

---

[23] 18 U.S.C. § 3582(c)(2) ("[I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.").

"straightforward." The Government also contended that the district court need not hold a hearing. It further noted that Robinson had previously been sentenced under a Guideline range of 168 to 210 months (receiving a 180-month sentence) and that his range would become 140 to 175 months if the court applied the retroactive crack amendment. The Government argued that if the district court decided to grant the motion, Robinson should be given a new sentence of 175 months, the sentence at the top of the new Guideline range. To support its suggested sentence, the Government argued, among other things, that releasing Robinson earlier was not justified given his criminal history. The Government pointed out that Robinson had been convicted of a handful of crimes in the past; that Robinson had been arrested in other instances; and that he had received three disciplinary infractions while in prison. Finally, the Government argued that United States v. Booker[24] did not apply to a § 3582(c)(2) proceeding, meaning that the Guidelines would be mandatory and the district court could therefore not sentence Robinson below the bottom end of the new Guideline range—i.e., 140 months. The Government admitted that this court had not yet resolved the issue and that the only circuit court to do so in a published opinion, the Ninth Circuit, had held that Booker renders the Guidelines advisory in a § 3582(c)(2) proceeding.[25]

The district court immediately issued a one-page order giving Robinson a new sentence of 175 months without providing him an attorney. The court did

---

[24] 543 U.S. 220, 125 S. Ct. 738 (2005) (rendering the Guidelines advisory to remedy their constitutional shortcomings).

[25] United States v. Hicks, 472 F.3d 1167, 1169 (9th Cir. 2007) ("Because Booker abolished the mandatory application of the Sentencing Guidelines in all contexts, and because reliance on its holding is not inconsistent with any applicable policy statement, we reverse the district court and hold that Booker applies to § 3582(c)(2) proceedings."); but see United States v. Hudson, 242 Fed. App'x 16 (4th Cir. 2007), cert. denied 128 S. Ct. 1282 (2008) (concluding, in an unpublished one-paragraph opinion, that the district court did not abuse its discretion nor commit reversible error by concluding that Booker does not apply to § 3582(c)(2) proceedings).

not explain why it was not providing Robinson an attorney, what effect (if any) Booker might have on the sentencing process, or why it selected a 175-month sentence.

Two weeks later Robinson filed a motion for re-consideration. He provided context for his three disciplinary infractions by attaching the reports generated from those incidents. He also claimed the Government had made two factual misstatements regarding his prior arrest history.

Three days later the court denied Robinson's motion for re-consideration in a one-sentence order.

Robinson promptly filed a notice of appeal. He has since filed a motion in this court requesting that we appoint him an attorney. The Government has not responded.

## III.

The sole issue before us now is whether to grant Robinson's request for an attorney to represent him in this court. Since Robinson filed the motion on his own behalf without the help of an attorney, we liberally construe his request.[26] In doing so, we read Robinson's motion to contend that he should be appointed an attorney as a matter of right and as a matter of grace. We address each contention in turn.

## A.

There are three potential sources that could establish Robinson's right to an attorney—two constitutional sources and one statutory.

The first potential source of a right to counsel can be found in the Fifth Amendment's Due Process Clause, which the Supreme Court has interpreted to require the appointment of counsel for indigent defendants whenever

---

[26] See Johnson v. Quaterman, 479 F.3d 358, 359 (5th Cir. 2007) ("Briefs by pro se litigants are afforded liberal construction . . . .").

"fundamental fairness" demands it.[27]   Furthermore, due process requires a pragmatic balancing of three distinct interests to determine whether more process (such as providing a defendant an attorney) is constitutionally mandated:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[28]

The second potential source of a right to counsel for indigent defendants can be found in the Sixth Amendment's guarantee of the assistance of counsel. While the Supreme Court has held that "[c]ounsel for an indigent is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected,"[29] it has also stated that the Sixth Amendment does not mandate counsel once the defendant's direct appeal comes to an end.[30]

The third and final potential source of a right to counsel for indigent defendants can be found in 18 U.S.C. § 3006A.  That provision requires, among other things, appointment of counsel for direct appeals and any "ancillary matters" to the direct appeal.

In the 1995 opinion in United States v. Whitebird this Court held that an indigent defendant in a § 3582(c)(2) proceeding did not have a right to an

---

[27] Gagnon v. Scarpelli, 411 U.S. 778, 790, 93 S. Ct. 1756, 1763 (1973).

[28] Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976); see also Lassiter v. Dep't of Soc. Servs. of Durham County, 452 U.S. 18, 25–33, 101 S. Ct. 2153, 2158–63 (1981) (discussing applying the Mathews balancing test to a situation in which the question was whether due process required the appointment of an attorney).

[29] Mempa v. Rhay, 389 U.S. 128, 134, 88 S. Ct. 254, 257 (1967).

[30] Coleman v. Thompson, 501 U.S. 722, 755–57, 111 S. Ct. 2546, 2567–68 (1991); Pennsylvania v. Finley, 481 U.S. 551, 555–58, 107 S. Ct. 1990, 1993–95 (1987).

attorney under the Fifth Amendment, the Sixth Amendment, or 18 U.S.C. § 3006A(c).[31] In Whitebird we summarily dismissed the Fifth Amendment claim in a footnote by stating that "[t]his case does not present any due process concerns," and we likewise had no problem rejecting the Sixth Amendment argument.[32] Finally, we determined that the defendant had no statutory right to an attorney under § 3006A(c), as we interpreted "ancillary matters" as not including situations where a defendant files a § 3582(c)(2) motion.[33] The court determined that such motions are "too far removed [from the original criminal proceeding] to be considered 'ancillary.'"[34]

The sentencing procedure Robinson is subject to under his § 3582(c)(2) motion is different than the sentencing procedure for § 3582(c)(2) motions when Whitebird was decided. The sentencing procedure for § 3582(c) motions is governed by USSG § 1B1.10(b), which was amended in 2008. Therefore, the issues of concern for Robinson's § 3582(c)(2) motion are distinguishable from the facts in Whitebird. While previous courts had to determine what sentence they would have given the defendant in light of the facts as they existed at the time of the original sentencing, the new process requires district courts when answering this question to consider, in every case, "the nature and seriousness of the danger to any person or the community that may be posed by a reduction in the defendant's term of imprisonment" and allows district courts to consider "post-sentencing conduct of the defendant that occurred after imposition of the

---

[31] 55 F.3d 1007 (5th Cir. 1995); but see United States v. Alvarez, 210 F.3d 309, 310 (5th Cir. 2000) (agreeing with two other circuits that "a § 3582(c)(2) motion is not a civil postconviction action but a step in a criminal case") (internal citation and quotation marks omitted)).

[32] Whitebird, 55 F.3d at 1011 n.3.

[33] Id. at 1011.

[34] Id.

original term of imprisonment."[35]  The question, then, of whether a § 3582(c)(2) motion triggers either a statutory or constitutional right to an attorney—in either this court or the district court—is a different question now than it was before the amendments to USSG § 1B1.10(b).

We choose not to decide this issue now, however, since we have no briefing from either the defendant or the Government.  Moreover, we have no out-of-circuit guidance since no circuit court has yet addressed the issue of whether a defendant is now entitled to an attorney in a § 3582(c)(2) proceeding given the new complexities USSG § 1B1.10 has injected into the process.

B.

Assuming for the sake of argument that this § 3582(c)(2) proceeding is not ancillary to Robinson's original criminal case—but rather is collateral—we have discretion to appoint Robinson an attorney "in the interest of justice."[36]  We believe it is in the interest of justice to appoint Robinson counsel.

Robinson's appeal could raise a number of issues, and we would be more likely to reach the correct resolution of those issues (and therefore serve the interest of justice) if we had attorneys on both sides arguing their respective positions.  Those issues may include whether Robinson was entitled to an attorney as a matter of right in the district court, whether Booker applies to § 3582(c)(2) proceedings (as the Ninth Circuit has held), rendering the process set out in USSG § 1B1.10(b) advisory and granting the district court more discretion in crafting a new sentence, whether the district court erred by not holding an evidentiary hearing once he contested the factual basis of some of the Government's contentions, and whether the district court abused its discretion in not giving him a larger sentence reduction.

---

[35] USSG § 1B1.10(b), n. 1(B) (Mar. 2008 ed.).

[36] See Judicial Council of the Fifth Circuit, Plan for Representation on Appeal Under the Criminal Justice Act, § 3(B).

Robinson's motion is granted and counsel shall be appointed under the circuit procedure.

MOTION GRANTED.